103 F.3d 128
 154 L.R.R.M. (BNA) 2416
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CENTRAL MICHIGAN ADMINISTRATIVE DISTRICT COUNCIL,
Petitioner-Cross Respondent.
v.
NATIONAL LABOR RELATIONS BOARD, Respondent-Cross Petitioner.
 Nos. 95-5548, 95-5698.
 United States Court of Appeals, Sixth Circuit.
 Dec. 16, 1996.
 
 On Petition for Review and Cross Petition for Enforcement of an Order of the National Labor Relations Board, No. 7-CA-33506.
 REVIEW DENIED; ORDER ENFORCED.
 Before: KENNEDY and NORRIS, Circuit Judges; MATIA, District Judge.*
 OPINION
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 The Bricklayers and Allied Craftsmen Central Michigan Administrative District Council (the "District Council") seeks review of a decision of the National Labor Relations Board (the "NLRB") affirming the determination of the administrative law judge (the "ALJ") that the District Council violated §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), 158(a)(3) (1994), by refusing to offer Ursula Schrader a secretarial position "because of her union affiliation." The NLRB cross-petitions for enforcement. We deny the petition for review and grant the cross-petition for enforcement with respect to a violation of § 8(a)(3). We express no opinion concerning any violation of § 8(a)(1).
 
 
 2
 The parties are familiar with the facts, and there is no reason to restate them here. The allocation of the burden of proof in this kind of case is as follows: (1) first, the General Counsel must establish a prima facie case that anti-union animus contributed to the employer's decision to take a specific action, such as refusing to hire an applicant; (2) next, the employer must prove by a preponderance of the evidence that the adverse action would have been taken even if the affected individual had not been involved with the union at issue; and (3) finally, the General Counsel has an opportunity to demonstrate that the employer's claim is merely a pretextual cover for anti-union animus. See NLRB v. Transportation Management Corp., 462 U.S. 393, 403 (1983), modified, Director, Office of Workers' Compensation Programs v. Greenwich Collieries, 512 U.S. 267 (1994). While the ALJ did not invoke this specific formulation of the burden-of-proof scheme, the NLRB did. We review the NLRB's decision under a substantial evidence standard, setting aside a decision only where the incorrect legal standard has been applied or the evidence is insufficient to support factual findings. See NLRB v. Mead Corp., 73 F.3d 74, 78 (6th Cir.1996).
 
 
 3
 The District Council raises what we discern to be eight distinct challenges to the substantiality of the evidence. We shall address these in turn.
 
 
 4
 I. No Per Se Rule of "Once Anti-Union, Always Anti-Union"
 
 
 5
 The District Council's first argument is that the ALJ committed legal error by applying a conclusive presumption that once an employer has demonstrated animus toward a union, in this case Daryl Hollenback's hostility toward Teamsters Local 580, then any subsequent employment action consistent with that animus must be attributed to that anti-union sentiment. The District Council is correct that such a presumption is contrary to law. The problem with the argument is that the ALJ applied no such rule.
 
 
 6
 The General Counsel plainly satisfied the prima facie case requirement through the introduction of recorded telephone conversations of Hollenback telling Schrader to quit Teamsters Local 580 on pain of not being hired as the District Council's secretary. The District Council presented witnesses who testified that the real reason for not hiring Schrader was the belief that some contractual duty was owed to Local 14's secretaries by virtue of a successorship clause. Hollenback also testified that he was unaware that he had the sole authority to hire secretarial staff. The ALJ simply did not believe Hollenback. Even if the other union witnesses were sincere in their belief that hiring Sam Palazzolo's secretaries was a contractual obligation, the ALJ concluded that nothing justified the initial decision by Hollenback to have the executive and management committees make that hiring decision in the first place.
 
 
 7
 The ALJ found it "improbable in the extreme" that Hollenback was unaware of the authority that his position as director of the District Council involved. Having pursued that job vigorously for years, Hollenback could not plausibly claim that he did not understand the scope of his position. The District Council's constitution also speaks clearly on the matter. Another factor that swayed the ALJ was the lack of proof that anyone other than Palazzolo had ever actually read the supposedly binding successorship clause. While Hollenback had assured Schrader over the phone that he would research the validity of that provision, there is no evidence that he ever did so. Aside from Hollenback's uncovered perjury, which surely did not help the District Council's case any, the final nail in the coffin is the evidence that Hollenback said in late summer of 1992 that he would hire Schrader as the District Council's third secretary over his dead body. The ALJ simply disbelieved Hollenback, concluding that either the committees themselves had been manipulated or that, at a minimum, Hollenback had delegated the hiring decision to the committees with the full knowledge that the committees would go along with Palazzolo's efforts to bring along his secretaries.
 
 
 8
 The ALJ's decision does not rest on any assumption that the District Council violated some amorphous duty to hire Schrader. Rather, the ALJ's understanding of the case, based on the demeanor of the witnesses and the damning taped telephone conversations, was that Hollenback invidiously chose to delegate hiring responsibilities to the executive and management committees in order to ensure that Schrader would not be hired. That delegation for the improper purpose of keeping Teamsters Local 580 away from the District Council is the basis of the § 8(a)(3) violation. While we might not have interpreted the delegation of hiring duties in this manner were we to review the matter de novo, the evidence fairly supports the conclusion that Hollenback maintained his hostility toward Teamsters Local 580 at all times relevant to this case.
 
 
 9
 II. Schrader's Treatment As Compared To Other Candidates
 
 
 10
 The District Council's next argument is that Schrader was treated no differently from any other applicant for the secretarial positions. According to the District Council, no committee member mentioned any other candidate once Palazzolo aired his views regarding the hiring of his two secretaries. In other words, there was no unfair treatment, since all remaining candidates were effectively out of the running once Palazzolo began lobbying.
 
 
 11
 This argument ignores the basis for the ALJ's decision. The ALJ concluded that Hollenback, not Palazzolo or the committees, should have been the one to make the hiring decision. The choice to delegate that decision can be seen as part of Hollenback's attempt to deny Schrader a job. Similarly, his refusal to mention her as a potential candidate can be read as invidious in light of his known hostility toward Teamsters Local 580.
 
 
 12
 Hollenback claims that his working relationship with Schrader suffered a complete break-down. Hollenback claims that the rift was caused by Schrader's accusation that Hollenback had been involved in some sort of financial impropriety. Whatever the reason, one would obviously not expect Hollenback to go out of his way to advocate the candidacy of a secretary that he could no longer tolerate on a personal level. The problem for Hollenback is that his pattern of anti-union conduct raises the possibility that his assertion of a deteriorating working relationship is merely a cover for his anti-union sentiments. Looked at another way, the ALJ permissibly found that Hollenback was lying when he said that his decision regarding Schrader was not motivated by hostility toward Teamsters Local 580. The inference of anti-union motivation having already been established, Hollenback and the District Council bore the burden of proving that the actions subsequent to the recording of the phone calls were not driven by such improper sentiments. It was not error for the ALJ to have believed Schrader's version and to have discounted the union's story.
 
 
 13
 III. Evidence That Anti-Union Animus Motivated Hollenback's Actions
 
 
 14
 The District Council here argues that because (1) Hollenback did not lobby against Schrader or for anyone else and (2) the members of the committees testified that they believed Palazzolo's claims of a binding successorship obligation, there is no evidence that the decision not to offer Schrader a job was motivated by anti-union animus. However, that argument misses the point of the ALJ's conclusion: that Hollenback carried out his plot to keep Schrader out of the District Council by purposely delegating the hiring decision and then remaining silent, knowing that the committees would be swayed by Palazzolo. Hollenback did not need to lobby against Schrader for his scheme to succeed. His inaction in the face of Palazzolo's firm support for his own secretaries was just as damaging to Schrader's prospects as if he had personally lobbied on behalf of someone else.
 
 
 15
 Whether the committees believed in the successorship obligation is similarly irrelevant. Nobody seriously questioned the credibility of the various committee members. The offender was Hollenback, who, had he been acting in good faith, would have at least inspected the Local 14 contract with Teamsters Local 164 to determine whether the successorship clause could be binding. As business manager of Local 31, Hollenback probably had some familiarity with successorship clauses; and Schrader's contract contained such a provision. He knew or should have known that the District Council would not be bound, particularly if Local 14 remained in existence after the creation of the District Council. Even if that clause ultimately would be binding, Hollenback's failure even to read the clause supports an inference that other factors, such as impermissible anti-union animus, were really motivating him.
 
 
 16
 IV. Hollenback's Authority And Hiring By Consensus
 
 
 17
 The District Council cites testimony to the effect that Hollenback's authority was confined to making hiring recommendations to the executive committee, in an attempt to show that the motivation of the committees is relevant. The next argument is that, regardless of the text of the District Council constitution, the actual management in the first few months occurred by consensus. These arguments again miss the point.
 
 
 18
 The District Council constitution plainly states that the director has authority to hire office staff. It is only the terms and conditions of employment that are subject to approval by committee. With respect to management by consensus, the ALJ's conclusions are consistent with the view that Hollenback allowed decisions to be made by consensus in order to permit him to distance himself from the decisions ultimately reached. The use of a loose and delegated management system was part of Hollenback's plan to exclude Schrader, or at least the ALJ permissibly may have believed as much.
 
 V. Schrader As A Non-Applicant
 
 19
 The District Council then argues that § 8(a)(3) does not apply to Schrader, since she was not really an applicant for the secretarial jobs. She did not file a formal application, while at least three other individuals submitted applications. Because she did not apply, there was no unfair labor practice in the District Council's decision not to hire her.
 
 
 20
 The biggest weakness here is that the two individuals who were hired had not formally applied either. Palazzolo's recommendation was all that they needed. The same can be said of Schrader, insofar as she was led by Hollenback to believe that she had done everything necessary to get her hat into the ring. According to the NLRB,
 
 
 21
 Hollenback was aware that Schrader was interested in the job with the Council and offered it to her on the condition that she end her affiliation with Teamsters Local 580. Indeed, Hollenback admitted that he had excluded Schrader from consideration because she had gone behind his back and switched her membership to a local of which he disapproved.
 
 
 22
 That characterization is supported by the record, and Hollenback's statements to Schrader constitute a plain waiver of any requirement of formal written application.
 
 
 23
 VI. The Finding That Formal Application Would Have Been Futile
 
 
 24
 The NLRB commented, in passing, that any formal application by Schrader would have been futile. That statement is made in the course of working through the question of whether Schrader's failure to submit a written application takes her outside the scope of § 8(a)(3). It should be noted that this comment is in no way essential to the NLRB's decision.
 
 
 25
 The District Council argues that there is no evidence that such an application would have been futile. The evidence cited by the NLRB is the statement by Hollenback, made roughly four months after the hiring decision at issue, that the District Council would hire Schrader over his dead body. The District Council argues that this evidence is irrelevant. The District Council is simply wrong in suggesting that the statement that Hollenback would never hire Schrader is not probative of the issue of futility. There is no plausible argument that this sentiment arose only after the hiring decisions had been made, so the statement suggests something about the usefulness to Schrader of applying formally.
 
 
 26
 VII. Hollenback's Inaction As A Violation Of § 8(a)(3)
 
 
 27
 The District Council argues that there is nothing wrong with just sitting back and letting events run their course, even if one does secretly hope, out of anti-union animus, that a certain result will be reached. The District Council claims that Hollenback took absolutely no action against Schrader. The ALJ found, however, that Hollenback actively chose to delegate the hiring decision. Where there is a duty to act, the failure to act can be wrongful. Because the hiring of secretarial staff was the responsibility of Hollenback, his failure to carry out that task can violate § 8(a)(3) when motivated by improper purposes.
 
 
 28
 VIII. Consideration of Six Of The Taped Conversations
 
 
 29
 The District Council's final argument is that the six tapes recorded prior to April 14, 1992, are hearsay and that they are irrelevant to the issue of whether Hollenback bore anti-union animus in April of 1992. On the hearsay point, the District Council seems to be saying that the tapes cannot be allowed as admissions of a party opponent because until April of 1992 Hollenback was not an agent of the District Council. This argument fails for a number of reasons. First, the rules of evidence generally do not apply with full force in administrative proceedings. Second, the District Council does not identify with particularity statements it regards as objectionable, in the course of sixty-two pages of transcription, much of it single-spaced. Besides, the tapes were not offered to show that the District Council was biased against Teamsters Local 580, but rather to show that Hollenback himself was hostile to that union. It is not clear that the tapes were offered for the truth of any matter asserted in any event. Finally, the District Council does not point to any objection before the ALJ on the grounds of hearsay.
 
 
 30
 Were those six tapes excluded, only a single tape would be admissible. The District Council's argument that the last tape, when taken alone, is insufficient to demonstrate Hollenback's anti-union animus is, however, unavailing in light of the fact that it was proper for the ALJ to have considered the other six tapes. There is no error with respect to the tapes.
 
 CONCLUSION
 
 31
 The petition for review is denied and the cross-petition for enforcement granted as they relate to § 8(a)(3). Because we are not convinced that the record is sufficient to demonstrate a violation of § 8(a)(1), because the parties do not treat the two violations separately in their briefs, and because our resolution of the § 8(a)(3) issue renders a holding as to § 8(a)(1) unnecessary, we express no opinion on that aspect of the NLRB's decision.
 
 
 32
 KENNEDY, Circuit Judge, dissenting.
 
 
 33
 While I agree with much of the Majority opinion, I am unable to concur since I believe the Board failed to complete the necessary Mount Healthy analysis. Under Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977), the Board must determine whether the District Council would not have hired Schrader even if the protected conduct was not present because it had other legitimate reasons to support its decision. While the Board did consider the hiring of the two secretaries from Local 14 at the insistence of Sam Palazzolo, there were other considerations that strongly suggest that the Council would not have hired Schrader even if she had applied and even if there was no issue regarding her representation by Teamsters 580.
 
 
 34
 First, in strong contrast to the Board's statement that "[n]o evidence was presented showing that Hollenback harbored animosity towards Schrader for any reason other than her transfer of membership to Teamsters Local 580," the record showed that Hollenback suspected Schrader of spreading false rumors about Hollenback's alleged misuse of union dues. Whether or not Hollenback was correct in surmising that it had been Schrader who had been spreading rumors, a reasonable belief that she was the source of the rumors would constitute a legitimate justification for Hollenback and the District Council not hiring her as a trusted personal secretary for Hollenback.
 
 
 35
 Second, the two secretaries who were hired had successorship clauses in their contracts. At the time the Council was formed, Schrader was not represented by a recognized union. Thus, a secretary with less seniority would be hired over Schrader as long as that secretary had a successorship clause in a valid contract. The Board did not expressly decide this question. Rather, it simply noted that neither Hollenback nor any other Executive committee member actually checked Palazzolo's assertion that the District Council had a legal obligation to hire his secretaries because their contracts contained successorship clauses. There is nothing to suggest his assertion was untrue or that the District Council had any basis to question it. On remand the Board must determine whether the successorship clauses were valid and controlling. It also must consider Schrader's argument that she was still protected by the successorship clause in her then lapsed contract under Local 14.
 
 
 36
 For these reasons, I would affirm the Board's finding that an application was futile but reverse and remand the remainder of the order for the Board to consider whether the District Council would have reached the same decision not to hire Schrader even if Hollenback was motivated by animosity toward Schrader's affiliation toward Teamsters 580.
 
 
 
 *
 The Honorable Paul R. Matia, United States District Judge for the Northern District of Ohio, sitting by designation